UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MALIK BLACK, f/k/a ERNEST DUNHAM,

                Petitioner,                    **DECISION AND ORDER**
                                                  01-CV-0828

        -vs-

GLENN S. GOORD, Commissioner, N.Y.S.
Dept. of Correctional Services,

                Respondent.
_____

## INTRODUCTION

Petitioner, Malik Black ("Black"), filed this petition for habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on charges of second degree murder. The parties have consented to disposition of this matter by the undersigned pursuant 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from the shooting death of Gregory Rodgers ("Rodgers") on October 31, 1993, at 532 Seward Street in the City of Rochester. Rodgers died as a result of multiple gunshot wounds, two to the head and one to the chest. Black, who at that time was known as Ernest Dunham, was eventually arrested and indicted by a Monroe County grand jury on five counts:  second degree (intentional) murder (N.Y. Penal Law § 125.25(1)); second degree (depraved indifference) murder (N.Y. Penal Law § 125.25(2)); second degree (felony) murder (N.Y. Penal Law § 125.25(3)); and first degree robbery (N.Y. Penal Law § 160.15(3), (4)).  Black was tried before a jury in Monroe County Court (Bristol, J.).

The prosecution presented evidence that just minutes before his death, Rodgers had been visiting at the home of Kenya Matthews ("Kenya") at 879 Jefferson Street. At the time, Kenya was Black's girlfriend. Also present at the house were Black; Kenya's cousin, Chandra Matthews ("Chandra"); Robert Carlos ("Carlos"); Adam Bowen ("Bowen"); Jeremy Siplin ("Siplin"); and Kenya's and Chandra's children. Carlos was in the kitchen with Bowen and Siplin, and Black and Kenya were in a nearby bedroom. T.542.[1] Chandra and the children were in the living room. When Rodgers arrived at Kenay's residence, he joined the men sitting the kitchen and was talking with them when Kenya and Black came out of the bedroom. Chandra heard Kenya said something to the effect of, "Don't say anything," while Siplin held her back from going into the kitchen. T.623-24. Both Chandra and Kenya testified that Black then confronted Rodgers verbally, calling Rodgers a "bitch ass nigger" and stating something to the effect of, "That was real foul, that shit you did." T.624-25, 692. Rodgers replied, "What are you talking about?" T.625. Black then said to Bowen, "Give me the tool," referring to the gun that Black had just given him in the bedroom. T.626, 689, 693. Bowen handed it over. Chandra and Kenya recounted that Black held the gun right up against Rodgers's head and ordered him to strip. T.627-28, 694. At first, Rodgers tried to laugh it off, but he started to comply when Black yelled at him. T.694. When Rodgers went to remove his shirt, he threw it over Black's face and knocked the gun out of Black's hand, causing it to go flying under the table. T.696. As Black and Rodgers struggled, Black eventually made his way under the table and picked up the gun. *Id.* By this time, Chandra had run out of the house, with Rodgers right behind her, and Black following him. *Id.* In his hurry to escape, Rodgers left his coat, pager and keys in Kenya's kitchen.

---

[1] Citations to "T.__" refer to the trial transcript.

Chandra was already across the street when she heard the first shot fired somewhere behind her. T.630-31. Chandra looked around and saw Black standing on the porch, holding the gun and pointing in the direction where Rodgers had run, which was  through the "cut," a driveway that led into some backyards. T.631-32. As Chandra turned right to head in the other direction, she saw Black running after Rodgers. T.634. Kenya also saw Black chasing after Rodgers, firing a gun at him. T.698. She called form Black to come back to the house but he did not. Kenya testified that Carlos and Siplin grabbed Rodgers' coat and belongings and left the house. T.699.

Eventually, Black returned to Kenya's house and announced to Kenya and Chandra, "[T]hat kid is dead." Chandra asked him how he knew, and he responded, "[B]ecause [I] shot him in the head." T.638. Chandra did not believe Black, but he insisted that he had stood over Rodgers and shot him in the head in front of the house belonging to some of Chandra's cousins on Seward Street. T.701-02. Chandra went outside to investigate and discovered Rodgers's dead body at the location on Seward Street (number 532) that Black had indicated.

Wayne Walker ("Walker"), the resident of 532 Seward Street, stated that he heard three sets of three gunshots. T.446 (Walker). Just before the last series of gunshots, Walker heard a male voice say, "Where do you think you're going?" *Id.* When the shooting stopped, Walker ventured outside and found Rodgers, fatally shot.

Back at the house, Kenya overheard Black talking to Bowen. T.703. Black told Bowen that when they were running through the yards, Rodgers slowed down somewhat and said that he was all right. *Id.* Kenya testified that Black recounted that he caught up to Rodgers and said, "[T]hat was some bitch that he pulled or something in that category and he [Black] shot him

[Rodgers] again." *Id.* Before Black left Kenya's house, he announced that he was going to dye the victim's coat white and have a purple lining put in it. T.704.

Kenya admitted that when she first spoke to the police, the statement she gave was not true "because [Black] had not been arrested on the murder charges yet" and "everyone thought that he was getting out soon." T.706-07. She stated that she had two children and that she lived by herself, and that all the people who hung around her house were involved with Black. T.707. Kenya testified that she told the truth to the grand jury because by that time, Black had been arrested. *Id.*

Two spent casings and a spent bullet were recovered at the crime scene, and were determined to have been fired from the same .38-caliber semi-automatic handgun. The murder weapon was never found, however.

The jury returned a verdict acquitting Black of all charges in the indictment except for one count of second degree (depraved indifference) murder. He was sentenced to twenty-five years to life in prison.

Represented by new counsel, Black appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Black also filed a *pro se* supplemental brief. The Appellate Division unanimously affirmed his conviction on May 7, 1999. *People v. Dunham*, 261 A.D.2d 909, 692 N.Y.S.2d 244 (App. Div. 4th Dept. 1999). The New York Court of Appeals denied leave to appeal on August 10, 1999. *People v. Dunham*, 93 N.Y.2d 1017, 697 N.Y.S.2d 576 (N.Y. 1999). Black filed no motions for collateral relief in state court.

The habeas petition was filed on October 16, 2001. Black, represented by Charles Buxton, Inmate Law Library Clerk, raises the following grounds for relief: (1) the delay in

arresting petitioner resulted in the denial of the Sixth Amendment right to counsel, the right to

testify, and due process; (2) petitioner was denied of his Sixth Amendment right to be present at

all material stages of his trial; (3) the trial court's failure to dismiss a juror *sua sponte* was an

abuse of discretion and violated petitioner's right to due process and an impartial jury; (4) trial

counsel was ineffective; and (5) petitioner was denied his Sixth Amendment right to be

represented by counsel of his own choice. *See* Petitioner's Memorandum of Law ("Pet'r Mem.")

(Docket #3). Respondent has not raised the defenses of non-exhaustion or procedural default

with respect to any of Black's claims, and the claims all appear to be properly before this Court

on habeas review. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction

must demonstrate that the state court's adjudication of his federal constitutional claim resulted in

a decision that was contrary to or involved an unreasonable application of clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

### Merits of the Petition

**1.      Delay in Arrest**

Black contends that there was a two-month "unjustifiable" and "intentional" delay in

arresting him in connection with the Rodgers homicide violated his "rights to assistance of

counsel, to testify on [his] own behalf, and to due process[.]" Pet'r Mem. at 9 (Docket #3). On direct appeal, the Appellate Division "reject[ed] the contention of defendant that the two-month delay between the questioning by the police and his arrest, during which time he pleaded guilty to an unrelated crime, violated his right to counsel. Defendant has no constitutional right to be arrested[.]" *People Dunham*, 261 A.D.2d at 910 (citing, *inter alia*, *Hoffa v. United States*, 385 U.S. 293, 310 (1966)).

As the Appellate Division noted, the right to be arrested simply is not guaranteed by either the New York state or the federal constitution. *See Hoffa*, 385 U.S. at 310;[2] *accord United States v. De Biasi*, 712 F.2d 785, 795 (2d Cir. 1983) ("[T]here is no support for [defendant's] novel suggestion that he was constitutionally entitled to an arrest the moment there was probable cause to arrest.") (citing *Hoffa*, 385 U.S. at 310; *United States v. Waltzer*, 682 F.2d 370, 373 (2d Cir. 1982)).  The Second Circuit has explained that delay prior to arrest "is usually free of the sometimes damaging effects of excessive post-arrest delay" because, until a suspect has been arrested, he "has not been deprived of his freedom or been publicly accused." *United States v. Feinberg*, 383 F.2d 60, 64 (2d Cir. 1967).

Furthermore, Black's claim that his Sixth Amendment right to counsel was violated also must fail because the Sixth Amendment right to counsel does not attach until "adversary judicial criminal proceedings have been initiated against [the defendant]." *Kirby v. Illinois*, 406 U.S. 682,

---

[2] "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa*, 385 U.S. at 310 (footnote omitted).

688 (1972) (citing cases). Even though petitioner had already been charged with the robbery and criminal possession of a weapon charges, it would make no difference to the outcome here as the Sixth Amendment right to counsel is "offense-specific." *E.g.*, *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("The Sixth Amendment right [to counsel], however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (citations and internal quotation marks omitted)). Thus, Black could have been questioned regarding the Rodgers homicide even in the absence of counsel. *See id.*

Finally, Black claims that the alleged delay prior to his arrest compromised his Fifth Amendment right to testify in his own behalf at trial. The Supreme Court noted in *United States v. McDonald* that "delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment." 456 U.S. 1, 7 (1982) (citing *United States v. Lovasco*, 431 U.S. 783, 788-789 (1977)). In *Lovasco*, the Supreme Court rejected respondent's argument, based on *United States v. Marion*, 404 U.S. 307, 324 (1971), that "due process bars prosecution whenever a defendant suffers prejudice as a result of pre-indictment delay." 431 U.S. at 789. Rather, the Supreme Court has held that *Marion* stands for the proposition that "proof of prejudice is generally a necessary but not [a] sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* In other words, a defendant must show that the delay "caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over

the accused." *Id.*

Black argues that the "ultimate purpose" underlying the pre-arrest delay was "to gain the tactical advantage of securing the weapons conviction first, so it could be either used as a deterrent to discourage [him] from testifying . . . or used for its prejudicial affect [*sic*] during the cross-examination of [him] if [he] chose to testify." Pet'r Mem. at 15 (Docket #3). Petitioner implies that had he known that he was a suspect in the Rodgers homicide, he might not have pled guilty to the criminal possession of a weapon charge due to the effect it could have on his decision to testify at later trial on the Rodgers murder. As evidence of the prosecution's bad intent, he points to a statement in police investigative report that the assistant district attorney "requested [reporting officers] wait until after 12-22-93 to arrest Dunham due to several charges now pending against Dunham." Petitioner's Appendix of Exhibits at C.53. Ultimately, however, Black did not plead guilty to the weapons possession charge until February 7, 1994. The indictment in the Rodgers homicide subsequently was handed down on February 18, 1994, and a warrant for Black's arrest was issued the same day. In light of this chronology, the fact that the prosecutor asked the police to wait until after December 22, 1993, does not prove that the delay was the result of scheming on the part of the prosecutor to secure a tactical advantage over petitioner. Even assuming that Black based his decision not to testify on the trial court's ruling that the weapons conviction could be introduced by the prosecutor, he has not shown that his right to a fair trial was "substantially prejudiced" by his failure to testify. Habeas relief accordingly is denied on this claim.

**2.      Denial of right to be present at all stages of trial**

On the day scheduled for Black's arraignment on the homicide charges, and while the

trial court and counsel were waiting for petitioner to be brought into court, the court asked if any of the attorneys present in the courtroom were involved in Black's case. The prosecutor answered that he would be handling the matter for the district attorney's office but stated that he did not know who would be representing petitioner. The prosecutor added that there might be a conflict of interest with the public defender's office because several witnesses to the crime, including Robert Carlos, also were represented by that office. The court indicated the name of an attorney who could take the case, should there be a conflict with the public defender's office. The court then requested that the assistant public defender who was present stand in for the arraignment. At that time, petitioner entered the courtroom and was arraigned with the assistant public defender as his attorney. Within two months of the arraignment, petitioner had retained private counsel.

Black contends that had he been present during the side-bar discussion at arraignment, he would have been "capable of resolving the factual basis of the conflict issue right then and there"–that is, whether the public defender's office was in fact already representing Robert Carlos, who apparently was Black's cousin. Petitioner argues that "[he] would have saved the two months it took the Public Defender to verify the factual basis of the conflict of interest" and he "would have then gained two months of earlier defense investigation with a conflict[-]free attorney." Pet'r Mem. at 27-28 (Docket #3). Petitioner's argument is fairly creative but without merit.

It is a well-settled proposition that a criminal defendant has a constitutional right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975); *accord Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "The principle that the accused has a right to be present at all material stages of trial

inheres in the confrontation clauses of the United States and New York Constitutions and is

articulated in both federal and state rules of procedure." *Clark v. Stinson*, 214 F.3d 315, 322 (2d

Cir. 2000) (citing U.S. CONST. amend. VI; N.Y. CONST. art. I, § 6; Fed. R. Crim. P. 43; N.Y.

Crim. Proc. Law §§ 260.20, 340.50; *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *People v.*

*Parker*, 57 N.Y.2d 136, 139, 454 N.Y.S.2d 967, 440 N.E.2d 1313 (1982); *People v. Mullen*, 44

N.Y.2d 1, 4-5, 403 N.Y.S.2d 470, 374 N.E.2d 369 (1978)).  However, the defendant's right to be

present "is triggered only when the defendant's 'presence has a relation, reasonably substantial,

to the fulness of his opportunity to defend against the charge.'" *Cohen v. Senkowski*, 290 F.3d

485, 489 (2d Cir. 2002) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). Thus,

when the defendant's "'presence would be useless, or the benefit but a shadow,'" there is no

constitutional right to be present. *Cohen*, 290 F.3d at 489 (quoting *Snyder*, 291 U.S. at 105-06

and citing *United States v. Gagnon*, 470 U.S. 522, 526-27 (1985) (*per curiam*) (holding that

defendants' rights were not violated by an in camera discussion with a juror where the defendants

"could have done nothing had they been at the conference, nor would they have gained anything

by attending" )). *See also* Fed. R. Crim. P. 43(c) ("A defendant need not be present . . . when the

proceeding involves only a conference or hearing upon a question of law."). Similarly, New York

state law does not carve out any absolute right to be present during discussions of purely legal

matters. *See People v. Velasco*, 77 N.Y.2d 469, 472, 568 N.Y.S.2d 721, 722, 570 N.E.2d 1070

(N.Y. 1991) (holding that defendant's presence not required for charging conference in robing

room attended by attorneys for both sides involving only questions of law and procedure).  Thus,

as the foregoing Supreme Court precedent makes clear, the right to be present is "not absolute."

*Id.*

On the facts before the Court, there is no basis for finding that petitioner's constitutional right to be present was violated. Petitioner argues that he was "clearly in a position to have had peculiar knowledge as to whether Carlos was already being represented by the Public Defender's Office at the time that the conflict of interest issue was being discussed in [his] absence." Pet'r Mem. at 27 (Docket #3). Petitioner seems to be referring to New York's case law on the right-to-be-present issue which holds that in determining whether a defendant has the right to attend a pre-trial hearing, the "key factor is whether the proceeding involved factual matters about which defendant might have peculiar knowledge that would be useful in advancing the defendant's or countering the People's position." *People v. Dokes*, 79 N.Y.2d 656, 660, 584 N.Y.S.2d 761, 595 N.E.2d 836 (N.Y. 1992).  However, the right to be present at material stages of the trial is broader under New York law than under Federal law. *See id.*

Even assuming that the conflict of interest issue solely presented a question of fact, petitioner had no federal constitutional right to assist the court in resolving that issue of fact. *Colon v. Artuz*, 174 F. Supp.2d 108, 113 (S.D.N.Y. 2001) (citing *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985)). In any event, the issue of whether the public defender's office had a conflict of interest due to its representation of Carlos presented a mixed question of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698 (1984) (stating that whether conflict of interest exists is a mixed question of law and fact). Certainly, the public defender's office and the court would have been remiss if they had resolved the conflict of interest issue based solely on petitioner's say-so. Under these circumstances, where the benefit of petitioner's presence would have been "but a shadow," *Snyder*, 291 U.S. at 105-06, his failure to be present did not in any way "frustrate the fairness of the proceedings," *Faretta*, 422 U.S. at 819 n.5. Accordingly, habeas

relief is not warranted on this claim.

**3.      Denial of right to impartial jury**

Black contends that it was reversible error not to dismiss a prospective juror ("M.P.") on the basis that his answers to voir dire questions showed that he was incapable of being impartial. On direct appeal, the Fourth Department held that the trial court "did not err in failing, *sua sponte*, to dismiss a potential juror. The colloquy between the court and the juror did not reveal that the juror had a state of mind that [was] likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the trial." *People v. Dunham*, 261 A.D.2d at 910, 692 N.Y.S.2d at 245 (quotation omitted).

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). The defendant claiming that biased jurors were seated on his jury bears the burden of showing prejudice–that is, the "actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Irvin*, 366 U.S. at 723 (internal quotations and citations omitted); *accord, e.g.*, *Murphy v. Florida*, 421 U.S. 794, 800 (1975). The Supreme Court has held that the question of whether jurors have opinions that disqualify them is one of historical fact to which the habeas statute's presumption of correctness[3] applies. *Patton v. Yount*, 467 U.S. 1025, 1037-38 (1984) (citing, *e.g.*, *Rushen v. Spain*, 464 U.S.

---

[3] At the time that *Yount* was decided, the presumption of correctness to be applied in habeas corpus proceedings was codified at 28 U.S.C. § 2254(d). Since the habeas statute was amended in 1996, the presumption has been set forth at 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

114, 120 (1983)) (holding that state court's determination that jurors' deliberations were not biased by ex parte communications is a finding of fact)). Furthermore, a federal court sitting in habeas review is not permitted to redetermine the state trial court's factual findings regarding the credibility of jurors whose demeanor has been observed by the trial court–and not by the habeas court–and must more than simply disagree with the state court in order to reach a different result. *Yount*, 467 U.S. at 1037 (stating that because "the determination is essentially one of credibility, and therefore largely one of demeanor [,] . . . the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference'") (citing *Marshall v. Lonberger*, 459 U.S. 422, 433-35 (1983) (habeas court must conclude that trial court's credibility findings "lacked even 'fair[ ] support' in the record") (in turn quoting *Sumner v. Mata*, 455 U.S. 591 (1982) (alteration in original)). Thus, the "trial court's findings of juror impartiality may 'be overturned only for "manifest error.""" *Mu'Min v. Virginia*, 500 U.S. 415, 428-29 (1991) (quoting *Yount*, 467 U.S. at 1031) (in turn quoting *Irvin*, 366 U.S. at 723). In other words, the question for the habeas court is "whether there is fair support in the record" for the state court's conclusion that the challenged jurors would be impartial. *Yount*, 467 U.S. at 1038.

The relevant portion of the voir dire concerning the juror at issue is set forth below:

| | |
|---|---|
| The Court: | Mr. [P.], you have checked victim of a crime. Same question[,] is that going to effect [*sic*] you here? |
| Prospective Juror: | House burglary. No. |
| The Court: | Again, the prosecution doesn't have a leg up because of that, because you were the victim of a crime and you kind of like wise [*sic*] - - |
| Prospective Juror: | No. |
| The Court: | I take it you're not so mad at anything the police did that - - |
| Prospective Juror: | No. |
| The Court: | - - prosecution is starting at a disadvantage? |
| Prospective Juror: | No. |

| | |
|---|---|
| The Court: | Al right. You have also indicated that you know police officers or people in law enforcement. |
| Prospective Juror: | I have a daughter and nephew. |
| The Court: | With - - who with? |
| Prospective Juror: | Daughter's with North Carolina. And nephew with the Sheriff Department. |
| The Court: | Who is your nephew? |
| Prospective Juror: | Mark Sevino. |
| The Court: | You know what I am going to ask you, you have, obviously, occasionally see [*sic*] your daughter even though she's in North Carolina. People talk about this job[;] is there any attitude that you have heard expressed that you think might effect [*sic*] you here? |
| Prospective Juror: | I don't think so. |
| The Court: | Okay. Now, you seem a little hesitant there. I know it's probably that you're being thoughtful in thinking about it but you tell me. |
| Prospective Juror: | I don't think it would effect [*sic*] my decision. |
| The Court: | You have heard by that I mean you have heard some attitudes expressed? |
| Prospective Juror: | Yes. |
| The Court: | Okay. Again, it's very important that if any attitudes - - I take it it has to do with the system and it not working the way it should sometimes, is that - - |
| Prospective: | No, that wasn't it at all. |
| The Court: | What was the attitude? |
| Prospective Juror: | I rather not say. |
| The Court: | Could you come up here and let us know? |
| Prospective Juror: | I don't think it's that important. |
| The Court: | Okay. Why don't you come on up; it probably isn't, but I would appreciate you coming up. |

(There was an off the record, side bar discussion held).

T.285-87. That the was the end of the trial court's questioning of juror M.P.

The Court finds that the juror's statements to the trial court do not come close to establishing that the juror was incapable of being impartial. First of all, I note that at the beginning of the voir dire, juror M.P. was unequivocal in stating that despite having been the victim of a crime, he would not be biased in favor of the prosecution or the defense. Contrary to

petitioner's contention, the sidebar discussion did *not* have to do with "attitudes which may have been expressed by [the juror's] nephew dealing 'with the system and it not working the way it should sometimes[.]'" Pet'r Mem. at 30 (Docket #3). The juror specifically stated that his concern had nothing to do with that topic. *See* T.286.

Neither defense counsel's nor the prosecutor's challenges were placed on the record, but, significantly, it does not appear that  defense counsel challenged the juror for cause or exercised a peremptory strike. The Court finds it noteworthy that neither defense counsel nor the prosecution felt it necessary to further question the prospective juror about his potential biases. Petitioner has offered only speculation about the juror's alleged lack of impartiality, which is clearly insufficient to support a finding of  error–let alone "manifest error"–on the part of the trial court. Habeas relief is not warranted on this claim.

**4.     Ineffective assistance of trial counsel**

Black contends that trial counsel's performance was "so deficient as to amount to the substantial equivalent of no representation at all[.]" Pet'r Mem. at 34 (Docket #3). Black points to a number of alleged flaws in counsel's performance which the Court will consider in turn. As discussed more fully below, none of the these errors, taken singly or together, deprived Black of his Sixth Amendment right to the effective assistance of counsel.

**a.     Legal standard**

The Sixth Amendment, made applicable to the states by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. CONST. amend. VI.  That right is applied to defendants in the state systems through the Fourteenth Amendment. The "benchmark for judging

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland*, a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

      **b.**      **Alleged grounds of attorney ineffectiveness**

            **i.**      **Failure to present arguments at the *Sandoval* hearing**

Petitioner complains that, at the *Sandoval* hearing,[4] counsel failed to offer the following two arguments as to why petitioner should not be cross-examined about his prior weapon-possession conviction if he chose to testify: (1) cross-examining petitioner about that conviction

---

[4] "The purpose of a *Sandoval* hearing is to determine the extent to which the defendant, if he testifies, will be subject to impeachment by cross-examination about prior bad acts." *People v. Dokes*, 79 N.Y.2d at 660 (citing *People v. Sandoval*, 34 N.Y.2d 371, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974)).

was improper because his arrest and indictment were delayed from December 16, 1993, to February 18, 1994, "unjustifiably, intentionally, and for no other purpose than to obtain the weapon conviction first;" and (2) cross-examining petitioner about that conviction "would unduly compromise [his] right to testify with respect to the case on trial, while simultaneously jeopardizing the correspondingly important right not to incriminate [him]self as to the weapon conviction, which was pending on appeal and could have conceivably resulted in a new trial."

At the hearing, the prosecutor requested permission to introduce the third degree criminal possession of a weapon conviction to which Black had pled guilty prior to his arrest for the Rodgers homicide. The prosecutor asked to use proof of the conviction as well the underlying facts–in particular, Black's initial exculpatory statement to the police which was later recanted by virtue of his guilty plea on the charge. H.10.[5] The prosecutor also argued that there were three satisfied felony charges which he was entitled to introduce at trial: a second degree assault charge from 1993 in which Black and a co-defendant assaulted a person with bottles at a basketball game; a third degree criminal mischief charge in 1993 in which Black broke the windows on the car of someone with whom he had a dispute about money; and a first degree robbery charge in 1993 in which Black and a co-defendant ordered the victim, at gunpoint, to remove his clothes and then tied the victim up with shoe laces. H.11-13.

Trial counsel argued that the weapons possession charge was "too close" and would be "extremely prejudicial," noting that he did not know what it was being offered for except to show criminal propensity. H.18. He also correctly argued that the first degree robbery charge, which was so factually similar to the instant case, was too prejudicial. H.19-20. The court agreed with

_____

[5] Citations to "H.__" refer to the transcript of the *Sandoval* hearing.

defense counsel that the "satisfied" felony charges, including the first degree robbery charge, were inadmissible, but ruled that the prosecutor could use the third degree criminal possession of a weapon conviction and the circumstances underlying it. H.22.

In ruling on a *Sandoval* application, the trial court has a wide range of discretion. *Sandoval*, 34 N.Y.2d at 374. The court is charged with balancing the "probative worth of evidence of prior specific criminal, vicious or immoral acts on the issue of the defendant's credibility on one hand, and on the other the risk of unfair prejudice to the defendant. . . ." *Sandoval*, 34 N.Y.2d at 375. The argument concerning the delayed arrest and indictment on the Rodgers homicide was not relevant at all to the validity of the weapons possession charge or the propriety of using it to attempt to show Black's lack of credibility. Furthermore, the trial court clearly was well within its discretion in allowing the prosecutor to introduce the criminal possession of a weapon charge because Black's first exculpatory statement to the police followed by a guilty plea definitely raised questions as to his credibility, making the charge admissible under *Sandoval*. Finally, counsel did argue that the weapons possession charge would prejudice his client's right to testify.

Even had counsel raised the omitted argument concerning the alleged delay in arrest, there is no reasonable probability that the trial court would have changed its ruling and precluded the weapons charge, so Black was not prejudiced. Indeed, I note that counsel obtained a partially favorable ruling, securing the exclusion of what, in this Court's opinion, was the most prejudicial charge–the first degree robbery charge in which Black ordered the victim to undress, which was quite similar to the factual circumstances in the present case.

**ii.    Failure to impeach prosecution witnesses**

Black asserts that the trial testimony of Carlos, Chandra and Kenya "was directly contradicted by their written statements to the police and other police records in many important aspects, yet defense counsel completely failed to use them for impeachment purposes when cross-examining these witnesses." Pet'r Mem. at 39 (Docket #3). Contrary to petitioner's contention, trial counsel vigorously cross-examined Carlos about his prior criminal record and about potential deals he may have made with the prosecution, and attempted to impeach him with a prior inconsistent statement about what he had done with the victim's coat on the night of the murder. Counsel argued on summation that it was Carlos and Siplin, not petitioner, who were guilty of the murder and the robbery because Siplin was 5' 8" (as defense witness Tonya White testified the shooter was) and Carlos admitted at trial that he ran out of the house with the victim's coat, keys and pager. T.1190-91. Counsel invited the jury to reject as incredible Carlos's claim that he was actually going to return the coat to the victim later. *Id.* Emphasizing that Carlos was "a convicted felon awaiting trial on a shooting in jail," T.1192, counsel suggested that his claim that he had not made a deal with the prosecution was not believable.

With regard to Chandra, counsel made a concerted effort to try to impeach her concerning the fact that she did not tell the police in her statement that she saw Black fire a gun on the night of the incident. T.662-64. The court sustained the prosecutor's objection but held that if counsel asked Chandra whether the police investigator "ask[ed] her to tell him everything that happened that night that [she] observed," and Chandra did not say that she saw petitioner fire a gun, that would be "fair impeachment." T.664-65. Thereafter, counsel forced Chandra to admit that she never told the police in her statement that she saw petitioner fire a gun. T.667. On summation, counsel pointed out contradictions between her recollection of what she saw that night and what

her cousin, Kenya, saw. T.1197.

As for Kenya, defense counsel implied on cross-examination that her home was a "gate house," or a place where drugs are sold. He questioned her about the twenty police visits made in the year and a half that she had lived at the house. T.709. She testified that the shootings and drug deals which were the subject of those police visits did not involve her. T.710. Defense counsel questioned her repeatedly about her admitted lies to police investigators, noting that her statements to them were supposed to have been made under an oath to tell the truth–the same oath which she pledged at trial. T.712-13, 715. Counsel confronted her with the inconsistencies between her statements to the police and her statements before the grand jury and at trial, implying that the jury should not believe her now given her lies in the past.

Counsel's cross-examination of these witnesses was vigorous and pointed. He cannot be blamed simply because the jury rejected his attempts to impeach the witnesses' credibility and chose to accept their testimony, despite the inconsistences.

### iii.   Failure to introduce petitioner's exculpatory statement

Petitioner makes a somewhat convoluted argument that trial counsel should have attempted to introduce petitioner's exculpatory statement to the police, not for its truth, but to demonstrate that it was made *before* Kenya's statement exculpating *him*. Pet'r Mem. at 40-41 (Docket #3).  According to petitioner, given Kenya's admission that he never told her what to say, this fact would have demonstrated that it was highly improbable that her statement exculpating him was a lie (as she testified at trial) since the two statements were so similar. Petitioner's argument does not logically require the conclusion he asserts should be drawn. It is equally probable that even if petitioner did not tell her *what to say*, he may have told her what

was in his statement, and she–out of fear of reprisals, for instance–may have tailored her statement to make it more similar to his. Simply stated, there is no reasonable probability that the failure to introduce petitioner's statement could have had affected the verdict. Moreover, the decision not to introduce his allegedly exculpatory statement was one of the myriad tactical decisions that trial counsel makes during the course of representing a defendant which are entitled to substantial deference on collateral review.

>    **iv.    Failure to present evidence regarding petitioner's age, height and weight as compared to that of the victim**

Black points to the testimony of defense witness Tonya White, a twelve-year-old girl who witnessed the shooting from her house across the street and who described the man who shot Rodgers as 5' 8"-tall. Black faults trial counsel for failing to offer police records or testimony which allegedly would have established that he was 6' 2"-tall on the night of the incident. Trial counsel argued vigorously that the jury should credit White's testimony that the shooter was only 5' 8" and did in-court comparisons to illustrate petitioner's height. On summation, the prosecutor suggested while Black might have been 6' 2" at the time of trial, he was a year and a half younger (sixteen years-old) at the time of the incident and would have been shorter. Whether or not Black would have been able to prove conclusively he was actually 5' 8" at the time of the incident, that fact alone would not have been able to overcome the eyewitness testimony of Chandra and Kenya Matthews identifying Black as the shooter and his admissions regarding his culpability. Thus, even assuming that police records existed of Black's height at the time incident, Black was not prejudiced by counsel's failure to introduce them at trial.

>    **v.    Failure to investigate and present witnesses**

Petitioner faults trial counsel for not interviewing Adam Bowen, Jeremy Siplin, Herbert

Putnam, former defense counsel Anthony Leonardo, Investigator Barnes, and Investigator

Borriello. *See* Pet'r Mem. at 44 (Docket #3).  Petitioner claims that the testimony of Bowen,

Putnam and attorney Leonardo "would have established that Duran Washington committed the

murder[.]" *Id.* In support of this claim, he cites only to his own affidavit submitted in connection

with his habeas corpus petition and provides no affidavits from any of these allegedly key

witnesses. This is plainly insufficient to substantiate his claim.  *See, e.g.*, *United States v. Vargas*,

920 F.2d 167, 170 (2d Cir. 1990) (stating that petitioner's affidavit making allegations in a

"conclusory fashion" failed to demonstrate that counsel's decision not to call a witness was

unreasonable), *cert. denied*, 502 U.S. 826 (1991); *Muhammad v. Bennett*, 96 Civ. 8430, 1998

WL 214884 at *1 (S.D.N.Y. Apr. 29, 1998) (holding that "petitioner's speculative claim about

the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial

counsel).

###### vi.       Failure to challenge or adequately examine jurors during *voir dire*

Petitioner contends that trial counsel was ineffective in failing to adequately question

certain jurors who allegedly were biased in favor of the police and other law enforcement

agencies. *See* Pet'r Mem. at 46-48. Petitioner has offered nothing but speculation regarding the

abilities of these jurors to be fair and impartial. The Court has searched the record and cannot

find that, based on any of the juror's responses on voir dire, there was the "actual existence of

such an opinion in the mind of the juror as will raise the presumption of partiality." *Irvin*, 366

U.S. at 723 (internal quotations and citations omitted). Thus, Black cannot establish that he was

prejudiced by trial counsel's failure to question them more vigorously about their attitudes

concerning individuals involved in law enforcement.

### vii.   Inadequate summation

Black complains that trial counsel made a "pointless" argument regarding the failure of the police to adequately preserve and investigate the crime scene and states that this "attack on the integrity of the police could only serve to alienate those jurors who had friends and relatives who worked in law enforcement." Pet'r Mem. at 49 (Docket #3). He also argues that trial counsel "ineptly argued the real issue" at trial–the credibility of Kenya and Chandra Matthews. *Id.* Contrary to petitioner's contention, trial counsel did not devote the "vast majority" of his summation to a "pointless and damaging criticism of the police[.]" Counsel did argue that more technical investigation could have been performed at the crime scene, but that was in furtherance of his argument that there was a lack of physical evidence connecting Black to the crime. Counsel was careful to explain that he was not attempting to indict the police department. Also contrary to petitioner's contention, trial counsel spent a good portion of his summation carefully detailing why Kenya and Chandra Matthews, the two eyewitnesses, were not believable. The fact that the jury rejected counsel's arguments appears to have less to do with the quality of them and his presentation than with the jury's own assessment of the credibility of the key prosecution witnesses.

### viii.   Failure to request lesser included offenses

Black asserts that trial counsel erred in failing to ask that the court charge the jury on the lesser included offense of first degree manslaughter. He also claims that counsel failed to confer with him concerning that decision. *See* Pet'r Mem. at 49-50 (Docket #3).

At trial, defense counsel's strategy, however, was to present a defense of

misidentification–that someone else committed the murder. This type of a defense, which denies

guilt, is "'a strategy that practically precludes a request for an instruction on a lesser included

offense.'" *Otero v. Eisenschmidt*, No. 01 Civ.2562, 2004 WL 2504382 at *3 (S.D.N.Y. Nov. 8,

2004) (quoting *Yu v. United States*, 97 Civ. 2736, 1997 WL 423070 at *3 (S.D.N.Y. July 29,

1997) (internal quotation marks omitted) and citing, *inter alia*, *Brown v. Rick*, 01 Civ. 4310,

2003 WL 22801397 at *6 (S.D.N.Y. Nov. 25, 2003) (holding that counsel not ineffective for

failing to inform defendant of right to request lesser included offense because such a request is a

matter of strategy); *Smith v. Walsh*, 02 Civ. 5755, 2003 WL 21649485 at *7 (S.D.N.Y. July 14,

2003) (finding that counsel not ineffective for failing to request charge on lesser included offense

because such a charge "would have undermined counsel's strategy of seeking an acquittal");

*Domingo v. Greiner*, 99 Civ.1906, 2002 WL 362761 at *2 (S.D.N.Y. Mar. 5, 2002) ("While with

hindsight, counsel's decision not to seek a lesser included offense charge did not prove

successful, his decision not to give the jury an option that could result in a compromise verdict

was not unreasonable. . . . For petitioner's counsel to make an argument that petitioner should be

found guilty of [the lesser included offense] would severely undermine his basic argument that

petitioner should not be found guilty of any crime."); *Rios v. United States*, No. CV-91-4384,

1992 WL 328931 at *6-7 (E.D.N.Y. Oct. 13, 1992) ("Courts have declined to find ineffective

assistance of counsel where counsel pursues an exculpatory defense although such a choice

practically precludes a request for an instruction on a lesser included offense. . . . The tactical

decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial

deference. . . . Having presented no evidence on a partial defense, counsel had no reason or basis

to request an instruction on the lesser included offense.")). Black cannot show that trial counsel's

strategic decision to not pursue the lesser included manslaughter charge amounted to

constitutionally deficient performance. *See id.*  Habeas relief therefore is not warranted on this

claim.

The Court has reviewed the entire transcript and it is apparent that counsel provided

competent representation. The asserted shortcomings in counsel's cross-examination of the key

prosecution witnesses amount to nothing more than a hypercritical attack, made with the clarity

of hindsight. As such, they cannot support a claim of ineffective assistance of counsel.

**5.      Denial of Sixth Amendment right to petitioner's counsel of choice**

"[T]he right of a defendant in a criminal case to counsel of his choice is a right of

constitutional dimension but is not absolute." *United States v. James*, 708 F.2d 40, 44 (2d Cir.

1983); *see also Wheat v. United States*, 486 U.S. 153, 159 (1988) ("[W]hile the right to select

and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the

essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant

rather than to ensure that a defendant will inexorably be represented by the lawyer whom he

prefers.") (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *Jones v. Barnes*, 463 U.S. 745

(1983)). When there exists the possibility that a lawyer may function as an unsworn witness at

trial in violation of ethical canons, *see* N.Y. Jud. L. DR 5-102(A), the defendant's Sixth

Amendment right to trial counsel of his choice may be required to yield. *See, e.g.*, *United States

v. Locascio*, 6 F.3d 924, 933-34 (2d Cir. 1993) (noting that the possibility that trial counsel

would function in his representational capacity as an unsworn witness for defendant was a strong

basis for disqualification).

When counsel's relationship to his client results in "his having first-hand knowledge of

the events presented at trial," he functions as an unsworn witness by acting as advocate at trial. *Id.* at 933. Even if the attorney is not actually called as a witness, the same concern arises: "[An attorney's] role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Id.* (citing *United States v. McKeon*, 738 F.2d 26, 34-35 (2d Cir. 1984) (requiring disqualification where attorney would be essentially acting as both an advocate and a witness); *United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir. 1982) (upholding disqualification where an attorney would act as an unsworn witness for defendant). When an attorney is an unsworn witness, "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired." *Id.* Thus, a waiver by the defendant is "ineffective in curing the impropriety in such situations, since he is not the party prejudiced." *Id.* (citing *Cunningham*, 672 F.2d at 1074-75).

Following the *Sandoval* hearing, the prosecutor informed the court that attorney Leonardo "for the first time in [his] recollection" was asserting that he "may potentially bring out some specific information as to the death of Duran Washington and other facts[.]" H.27-28. The prosecutor explained that because Leonardo previously had represented other individuals involved in the Duran Washington cases, Leonardo himself could be a person with knowledge about the matter and a potential witness. *Id.* at 28-29. The prosecutor requested that attorney Leonardo be relieved as counsel for Black.  The court asked Leonardo if he "agree[d] with the potentiality of [him] as a witness" and if he had any objection to being disqualified. Attorney Leonardo replied,

No. I think in representing Mr. Dunham, Your Honor, getting into this homicide,

-26-

Mr. Washington's homicide, it would be critical to his defense and that's an application I did make to you, Your Honor, and there's a possibility I could be a witness and I do have information  - -

H.30. Counsel agreed with the court that he could not be "lawyer and a witness at the same time." The court ascertained that petitioner understood that principle and stated that "to protect [petitioner's] right, I will relieve Mr. Leonardo and that's without any objection on Mr. Leonardo's part, correct?" H.31. Counsel responded affirmatively. *Id.*

First of all, based on the record before the Court, petitioner cannot be heard to complain that the disqualification of attorney Leonardo was against his wishes. He clearly stated that he acquiesced in counsel being relieved of representing him. Furthermore, given counsel's assertion that he had knowledge that could make him an unsworn, and potentially a sworn, witness, the trial court did not abuse its discretion in ordering the disqualification. *See Locascio*, 6 F.3d at 935 (citing *Wheat*, 486 U.S. at 163-64; *United States ex rel. Stewart on Behalf of Tineo v. Kelly*, 870 F.2d 854, 856 (2d Cir. 1989)).

## CONCLUSION

For the reasons stated above, petitioner Malik Black's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
     VICTOR E. BIANCHINI
   United States Magistrate Judge

DATED:        March 6, 2006
              Buffalo, New York.